> Decree affirmed and the appeal dismissed at the costs of the appellant.

## APPEAL OF J. J. WAGENHORST.

[WAGENHORST v. KISTLER'S EXRS.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF LUZERNE COUNTY, IN EQUITY.

Argued April 18, 1889—Decided April 29, 1889.

Where it appears on an appeal from a decree dismissing exceptions to an account reported, that the account was stated in accordance with the preliminary decree ordering an account, and the evidence upon which the preliminary decree was based is not supplied, that decree will not be revised or corrected by the Supreme Court.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and MITCHELL, JJ.

No. 119 January Term 1889, Sup. Ct.; court below No. 3 June Term 1880, C. P. in Equity.

To the number and term of the court below, referred to, J. J. Wagenhorst filed a bill in equity against William Kistler and Rufus Kistler, executors of the will of Stephen Kistler, deceased, praying for an account of the management of a saw-mill and its appurtenances, with certain timber rights in connection therewith, and for a reconveyance of the same to the plaintiff in the bill. Said Stephen Kistler died when the bill was about to be filed, and it was then filed against his executors. The defendants made answer, and subsequently, in disregard of the prayer of the bill for a reconveyance to the plaintiff, as was alleged, conveyed the property, the subject matter of the proceeding, to one Andrew Seabring.

After a preliminary hearing, master's report and exceptions thereto, on July 27, 1885, the court made a decree directing that the defendants account with the plaintiff, as follows:

1. For the proceeds of the lumber business as carried on by Stephen Kistler, with the co-operation of the plaintiff, from November 28, 1877, the time of the sheriff's sale, to November 15, 1878, with the materials purchased at said sheriff's sale, including those which came from the Mordecai Piersoll tract.

2. For the amount realized by Stephen Kistler and the defendants from the lumber manufactured by Emory Gilpin from the Mordecai Piersoll and Sidney Dillon lands from November 15, 1879, to June 13, 1879, under the Kistler-Gilpin contract of the former date.

3. For the amount realized by said Kistler and the defendants from the manufacture of lumber with the mill in question from the Mordecai Piersoll and Sidney Dillon lands from June 13, 1879, to August, 1880.

4. For the fair value of the property transferred by the defendants to the said Andrew Seabring in August, 1880, and on January 31, 1881.

5. For the fair value of any and all property transferred to Kistler by the sheriff's sale aforesaid, and not hereinbefore specified.

That in taking said account the defendants be allowed credit:

1. For the amount actually expended by the said Stephen Kistler in payment of his bids at said sheriff's sale, and in paying the expenses of the lumber business aforesaid, from November 28, 1877, to November 15, 1878, and for the amount due Callahan from plaintiff on February 15, 1878, on their contract of January 19, 1877, and for the amount paid Callahan as his share of the proceeds of the contract February 15, 1878.

2. For the amount paid Emory Gilpin under the Kistler-Gilpin contract of November 15, 1878, and the amount due said Gilpin on the latter date from the plaintiff on their contract of August 10, 1874, and for the amount paid by Kistler to Callahan in November, 1878, for the timber on the Mordecai Piersoll tract.

3. For the expenses of the manufacture and sale of lumber from the Sidney Dillon and Mordecai Piersoll lands from June 13, 1879, to August, 1880.

4. For the amount paid by Stephen Kistler or his estate to Emory Gilpin in the purchase of June 13, 1879.

5. For such other expenses paid by said Stephen Kistler or his estate in and about the business and transactions aforesaid as not hereinbefore specified, and for just and reasonable allowances for personal services of said Stephen Kistler and the defendants in and about the business aforesaid.

That the balance of the account thus taken be applied to the indebtedness of the said plaintiff to the said Stephen Kistler at the time of the sheriff's sale; first, to such as is not secured by judgment, and next, to the indebtedness thus secured, and if any balance then remains after payment of all of said indebtedness, the same to be paid to the plaintiff.

That the cause be referred to *Mr. Lyman H. Bennett*, as master to take the said account, and to report to the court, and that pending the taking of the same the defendants be enjoined against the collection of their judgments by a levy and sale on execution.

No appeal was taken from the foregoing decree, and the master stated an account between the parties in accordance therewith, and made report thereof to the court, when both

parties filed exceptions, those filed by the plaintiff sufficiently appearing in the following opinion, RICE, P. J.:

1. The plaintiff's first exception is that the master erred "in adopting such a theory and method of stating the account as caused him to disregard and override the admitted facts of the case. The answer admits and avers that the whole amount due from Wagenhorst to Kistler on the 21st of November, 1878, was $14,534.83. It is also admitted that the defendants received on account of Wagenhorst's property, twenty thousand dollars in August, 1880. Yet in the face of these admitted facts the report is made up bringing Wagenhorst $2,277.37 in debt."

If there is any merit in the foregoing exception, it is not because the master has erred in making up the account, but because the original decree, which he has strictly followed, is erroneous. But we think there is no such absurdity in the result reached, as would prove that the mode in which the master was directed to state the account disregards the admitted facts of the case. In the first place, the exception does not state all of the facts. For example it omits to mention Kistler's payment of $19,600 on account of the purchase in June, 1879, of the same property subsequently sold, as stated, for $20,000. Moreover, the statement of September 7, 1877, referred to in § 10 of the answer, was of the accounts between Wagenhorst and Kistler for advances made by the latter on his bark contract with the former, which were applied to the payment of Wagenhorst's indebtedness to the Drinkers. At that time Kistler had paid off the whole of the debt to the Drinkers, and taken assignments of the securities therefor. As against this was offset the indebtedness from him to Wagenhorst on the bark contracts, and the sum of $10,197.10 found due to Kistler in September, 1877, was the difference. All this is clearly and more fully set forth in the master's original report, and present report, and the subject matter of the settlement is shown by exhibit N, offered in evidence in the preliminary hearing. The residue of the sum of $14,534.83 is averred in the answer to be made up of amounts paid by Kistler for Wagenhorst, on notes indorsed by the former. It will be observed therefore that these transactions were separate and distinct from the lumber transactions on the Gilpin and Calla-

han lands. The defendants, from the outset, have denied their liability to account with the plaintiff for those transactions. The alleged admission contained in § 10 of the answer, and referred to in this exception, must be taken in consideration with that denial. It certainly cannot stop them from demanding a true accounting, if any is to be had, of transactions outside of the matters embraced in the settlement of September, 1877, and otherwise referred to in § 10 of the answer.

2. The plaintiff's second exception is that the master erred " in charging plaintiff with the $19,600 paid to Emory Gilpin; the said amount not having been authorized by plaintiff and having been paid to Gilpin without ever consulting plaintiff; and paid, moreover, not on plaintiff's account, but upon an arrangement to put Andrew Seabring in the place of Emory Gilpin."

The answer to this exception is twofold. In the first place, the decree under which the account was stated expressly directs that the defendants shall be allowed credit for the amount paid by Stephen Kistler, or his estate, to Emory Gilpin, in the purchase of June 13, 1879. This decree was made pursuant to the recommendation of the original report, which, in this particular, was not excepted to by the plaintiff. We observe also that in the statement of the account as understood by him, credit is allowed for this payment. In the second place, the defendants are clearly entitled to the credit, irrespective of the conclusiveness of the original decree. The agreement of November 26, 1877, which is the foundation of the plaintiff's case, has been construed to include, not only the personal property levied upon and sold by the sheriff, but also his rights and interests under his contracts with Gilpin and Callahan. In 1878, without any fault or interference of Kistler, Wagenhorst had fallen in arrears to Gilpin and Callahan, and was likely to forfeit his rights under those contracts, and also to lose the personal property which had been purchased by Kistler at the sheriff's sale and left in Wagenhorst's possession for the purpose of enabling him to carry out the plan for the payment of his debt to Kistler, contemplated by the agreement of November 26, 1877. The interests of both parties were in peril. Wagenhorst had tried and failed to make satisfactory arrangements with Gilpin; and then Kistler, with Wagenhorst's permission to make the best

arrangement he could, entered into negotiations which resulted in the Kistler-Gilpin contract of November 15, 1878. By this contract Gilpin agreed to sell Kistler the balance of the timber on the Sidney Dillon lands and to cut, saw and deliver the same as well as the remaining timber on the Mordecai Piersoll tract (which latter Kistler then bought of Callahan), at so much per thousand on delivery, and to withdraw his ejectment suit against the plaintiff for the land whereon the mill stood. In consideration whereof Kistler sold Gilpin his interest in the mill. This was followed by the contract of June 13, 1879, whereby Gilpin sold Kistler the same mill, 400 acres of the Sidney Dillon lands (being that part on which the mill stood) and all remaining timber on the whole 1700 acres, including his interest in the lumber railroad, for $19,600. As we understand the counsel, what the plaintiff complains of is, that the contract of November 17, 1878, having relieved them from the embarrassments growing out of the Gilpin claims against Wagenhorst, Kistler was not justified, without the plaintiff's consent, in substituting for it the contract of June 13, 1879. It will be observed, however, that both contracts contemplated a sale of the timber to Kistler; they differ, in that, under the first, Gilpin was to be paid so much per thousand feet after it had been manufactured into lumber and delivered, while under the second, he was to be paid a gross sum for all the property. Kistler was certainly compelled to make the first contract, in order to protect the interests of both himself and Wagenhorst against the Gilpin claims, and it does not appear that the second contract was not quite as advantageous to them as the first. On the contrary it appears from the testimony as to the value of the property that it was highly advantageous, at least to the plaintiff, for, as it turns out, the defendants have been compelled to account for the property at a considerably higher estimate of its value than Kistler paid for it. The defendants have strenuously contended from the first, that these contracts with Gilpin were entered into solely to protect the interests of their testator, and that he took the title free of any trust in the plaintiff's favor, after the latter had shown his inability to carry out the contract of November 26, 1877, and had abandoned and surrendered his rights under it. This contention has not been sustained. On the contrary

it has been held that Kistler took title as a trustee upon the principle thus expressed by the master : " The relations established by the agreement of November 26, 1877, required each to exercise toward the other the greatest degree of fairness in the protection of the property thereby held for their common benefit against a burden equally common, and permitted neither to entirely absorb the interest of his fellow by the purchase or extinguishment of the Gilpin debt on his own individual account." Accordingly, the defendants have been required to account for the proceeds of the lumbering business carried on under the Kistler-Gilpin contract of November 15, 1878, for the proceeds of the same business carried on by Kistler and the defendants after his purchase in June, 1879, until the sales to Seabring, and for the fair value of the property sold to Seabring. This being so, it would be manifestly unjust and inequitable not to credit them with the amount paid by Kistler for the land, timber and other property, for the profits, proceeds and value of which they are required to account, it not appearing that the sum paid was in excess of its value.

3. The third exception is that the master erred " in ruling that the plaintiff is not entitled under the circumstances of this case to claim the difference between the minimum cost of manufacturing the lumber and the market value of the same."

This exception, as we understand the counsel, has reference to the lumber sold to Seabring, and not to that manufactured into lumber before that time. The same question was raised in the preliminary investigation and duly considered in making the decree. It was then concluded that the rights and equities of the parties might properly be adjusted by requiring the defendants to account for the fair value of the property sold to Seabring. The question again came up when the parties commenced taking testimony on the account, and the court was asked for instructions, and to amend the decree. We then said: " As a basis upon which experts may found an opinion as to the fair value of the so-called timber rights, it might be admissible to show in any competent way the amount and kind of timber on the tracts at the time of the sale to Andrew Seabring, and we do not understand the master to exclude such evidence. The weight to be given to it is to be considered hereafter. But we think he was clearly right in rejecting the offer to show

'the actual amount of lumber which has been taken off these tracts, and the amount for which the lumber was sold, and the cost of manufacturing the same,' as the only evidence of the fair value of the timber rights in question." The earnest argument of the plaintiff's counsel has not convinced us that this conclusion was erroneous, and should be reconsidered.

We do not mean to retract anything that has heretofore been said regarding the propriety of the sale to Seabring in the face of the pending bill, but it must be remembered that the defendants were executors. It was scarcely feasible for them to carry on the lumbering operations for an indefinite term of years, and it does not appear that the plaintiff was able to discharge the indebtedness for which the property was held, take it off their hands, and conduct the business himself. Nevertheless, we agree with the plaintiff's counsel, that they are to be treated as wrong-doers, because, however honest their motives, they did not notify the plaintiff of their intention to sell, and give him an opportunity to find a purchaser, and also, because they voluntarily put it out of their power to re-convey the property to the plaintiff, if upon final hearing of the bill it should be found that he was entitled to that specific relief. Therefore, they are properly chargeable with the full value of the property, notwithstanding upon a careful computation of the kind and quantity of the timber, and close investigation of all the facts, this is found to be over $10,000 more than they actually received. Surely a trustee cannot sell the property, which, under certain circumstances, it will be his duty to convey to his cestui que trust, in total disregard of a pending bill calling upon him for an account and reconveyance, and then, when it is found that the plaintiff was entitled to the relief prayed for in the bill, claim that, as a substitute therefor, the plaintiff must take the price which he, the trustee, saw fit to sell it for.

But why should the defendants be charged with more than the full actual value? In support of his proposition the plaintiff's counsel refers us to the principle upon which the third point in Armory v. Delamirie was decided, but we do not think it applicable. The point decided was, that, where a person who had wrongfully converted property will not produce it, it shall be presumed, as against him, to be of the best description. " This," says the English commentator, " is an illustration of

that favorite maxim, omnia praesumuntur contra spoliatorem; which signifies, that if a man, by his own tortious act, withhold the evidence by which the nature of his case would be manifested, every presumption to his disadvantage will be adopted:" 1 Sm. L. C., 7 Am. ed., *472. Upon the same point the American commentator says: "A man who wilfully places the property of another in a situation where it cannot be recovered, or its true amount or value ascertained, by mixing it with his own, or in any other manner, will consequently be compelled to bear the inconvenience of the uncertainty or confusion which he has produced, even to the extent of surrendering the whole, if his share cannot be distinguished, or responding in damages for the highest value at which the property can reasonably be estimated:" Ibid., *473. This case is plainly distinguishable both in fact and principle, for the reason, that the kind, quantity, and stumpage value of the timber was capable of being ascertained, and has been ascertained, with reasonable certainty, as the report of the master abundantly shows. On the other hand, the result reached by the plaintiff, according to his method, goes far to prove that it is unreliable and unfair as a means of ascertaining the true value of the property. It involves an over-estimate of the amount of lumber and timber, and an under-estimate - of the cost of manufacture, and also, a disregard of certain well-known factors which must always enter into an ascertainment of the true value of property of this kind. If it is to be adopted it is not because the defendants, by their wrongful act, have put it out of the power of the court to ascertain the actual convertible value of the property with reasonable certainty, but because they ought to be compelled to pay something more by way of punishment. There are extreme cases, where even this harsh measure of justice would be justifiable, but in its worst aspect, we do not think this is such a case.

\*       \*       \*       \*       \*       \*       \*       \*

5. The plaintiff's fifth exception is that the master erred "in refusing to take the evidence offered to show that Andrew Seabring had grown rich out of the proceeds of this property of Wagenhorst, the plaintiff."

So many things would have to be investigated and considered in determining the sources of Andrew Seabring's alleged wealth,

and the methods by which it was acquired, that it is perfectly plain that the mere fact of his having grown rich would be very unreliable evidence of the value of this property, unless we could also go into a minute investigation of all the other facts connected therewith, which would be impracticable.

The plaintiff's remaining exceptions are to conclusions of fact; but we think these findings were warranted by the testimony, and are so fully explained in the report as to render it unnecessary for us to add anything further to what the master has said.

A formal decree was then entered, that the exceptions to the master's report of the account stated be dismissed and the statement of the account confirmed; that the plaintiff pay to the defendants the balance shown by the account, to wit: $2,277.37, with interest from March 19, 1888, and that upon the payment of said balance with interest, the plaintiff be discharged from all liability under certain judgments referred to by number and term. Thereupon the plaintiff took this appeal assigning as error the dismissal of his exceptions and the confirmation of the master's report stating the account.

*Mr. A. Ricketts* (with him *Mr. M. J. Wilson*), for the appellant.

*Mr. J. B. Storm* and *Mr. H. W. Palmer*, for the appellees.

PER CURIAM:

The assignments of error in this case are founded upon the allegation that the account as stated by the master is based upon an erroneous theory. Yet the fact is not denied that the account is stated in accordance with the decree of July 27, 1885, ordering an account. We cannot revise or correct that decree, even if erroneous, for the reason that the evidence upon which it was made is not before us. The case has been so well and elaborately discussed by both the learned master and court below, that it is not necessary to add anything to what they have said.

The decree is affirmed and the appeal dismissed at the costs of the appellant.